UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | CRIMINAL ACTION |
| v. | |
| | NO. 15-139-JWD-EWD |
| ERICK MENA-FLORES | |

**RULING AND ORDER**

This matter is before the Court on the Motion to Dismiss Indictment (Doc. 14) filed by Defendant Erick Mena-Flores.  The Government opposes the motion. (Doc. 16.)  After carefully considering the law and evidence in the record, Defendant's motion is denied.

**I.    Relevant Factual Background**

The basic facts are these.  The Defendant was born in El Salvador. (Doc. 25 at 15.)  On or about July 9, 2015, Defendant crossed the border from Mexico into the United States. (*Id.* at 35.)  The Defendant testified that he did so because he was robbed and subsequently attacked by a gang.  (*Id.* at 20.)

After crossing into the United States, he was detained by border patrol agents. (*Id.* at 22.)  When the agents learned that the Defendant did not have the appropriate paperwork to allow him to live and work in the country, the agents began expedited proceedings to transport him back to El Salvador. (*See id.* at 23-37; U.S. Exs. 1-6*.*)

As will be discussed below, the heart of this motion lies in the dispute as to what happened during these proceedings.  In short, Defendant claims that the proceedings were fundamentally unfair because they were conducted in English, not Spanish, and because no one interviewed him individually or explained to him the numerous forms presented to him.  The Government contests this, arguing that the proceedings were in Spanish, that he was interviewed

individually, and that the forms were explained to him multiple times. Nevertheless, both sides agree that the removal proceedings resulted in the Defendant being flown back to El Salvador.

On September 12, 2015, Defendant was stopped in Baton Rouge while en route to Florida. He was detained by DHS and later referred to the U.S. Attorneys.

## II. Procedural Background

On October 1, 2015, Defendant was indicted and charged with violating 8 U.S.C. § 1326(a), entitled "Illegal reentry following deportation." The indictment alleges that the defendant was an alien who had been previously removed from the United States on or about July 21, 2015, at or near Laredo, Texas. (Doc. 1.) The indictment further alleges that, on or about September 12, 2015, in the Middle District of Louisiana, the Defendant was knowingly present and found in the United States without having obtained the consent of the Attorney General or the Secretary for Homeland Security to apply for admission. (*Id.*)

The Defendant filed the instant motion on November 10, 2015. (Doc. 14.) On November 12, 2015, the Court set the matter for hearing on January 22, 2016. (*See* Doc. 15.) The Government filed its opposition on December 10, 2015. (Doc. 16.)

At the January 22, 2016, hearing, the Court heard witnesses through live testimony in open court and through live-streaming video conferencing. At the hearing, the Court advised the parties that it wanted post-hearing briefing from the parties concerning what they believed the evidence showed and why, under the appropriate standard, the Court should or should not grant the motion. (See Transcript of January 22, 2016, Hearing, Doc. 25 at 91-92.) The Court set the briefs due ten days from when the transcript was filed into the record. (*Id.*)

Additionally, due to technical difficulties at the hearing, one of the witnesses for the United States was unable to testify remotely. (Doc. 25 at 91-92, 101.) As a result, the parties

advised the Court that they would attempt to work out a stipulation or conduct a deposition of the remaining witness. (*Id.* at 101-02.)

On January 25 and 26, 2015, the Defendant and Government, respectively, requested transcripts of the hearing. (Docs. 21 and 22.)  On February 10, 2016, the transcript was filed into the record. (Doc. 25.)  Thus, the post-trial briefs would have been due on February 22, 2016.

On February 16, 2016, the parties filed a Joint Motion to Depose Government Witness in Connection with Defendant's Pending Motion to Dismiss. (Doc. 26.)  The Defendant waived his appearance at the deposition. (Doc. 27.)  The parties agreed that the deposition would be transcribed by a court reporter, that they would provide a complete transcript to the Court, and that the Court may use all or part of the deposition transcript in connection with its ruling on the instant motion. (*See* Doc. 26 at 3.).  The parties also advised the Court that the deposition would not occur until February 19, so they requested permission to reserve filing their post-hearing briefs until ten days after the completion of the deposition transcript. (Doc. 26 at 3-4.)

On February 18, 2016, the Court granted the joint motion. (Doc. 28.)  On March 16, 2016, the pertinent deposition was filed into the record. (Doc. 31.)  Thus, the deadline for post-trial briefs was March 28, 2016.  Both parties submitted their briefs on March 25, 2016. (Docs. 32-33.)

### III.  Discussion

#### A.  Parties' Arguments

In sum, Defendant argues that there is no support for an essential element of the crime (prior removal).  He collaterally attacks the prior removal as "procedurally improper and fundamentally unfair."  Defendant asserts that he was not given a one-on-one interview, the documents used in support of his removal were not read to him in his native language, or in fact

3

explained to him at all, and he was not given an opportunity to express his fears with regards to returning to his place of residence.

In response, the Government makes three main arguments. First, the Government asserts that asylum relief is ultimately discretionary, so the Defendant has no liberty interest in it deserving due process protection. As a result, any supposed failure of agents to inform the Defendant of this discretionary relief cannot render his removal "fundamentally unfair." Second, the Government contends that, contrary to Defendant's claims, he was interviewed in Spanish, not English, and that his removal proceeding was fundamentally fair. Third, the Government asserts that the Defendant must prove prejudice, and the Defendant cannot do so. According to the Government, the Defendant cannot make a valid asylum claim, and he would have been deported regardless of any alleged irregularities in the procedure.

### B. Relevant Standard

The Fifth Circuit recently and concisely summarized the appropriate standard to be applied in this case:

> An alien prosecuted for illegal re-entry under § 1326 may collaterally attack the underlying removal order. *United States v. Mendoza–Lopez,* 481 U.S. 828, 838–39, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). To succeed, he would need to establish that (1) the removal hearing was fundamentally unfair, (2) the proceeding improperly deprived him of the opportunity for judicial review, (3) the procedural deficiencies caused him actual prejudice, and (4) he exhausted any administrative remedies that were available to challenge the order. *United States v. Lopez–Ortiz,* 313 F.3d 225, 229 (5th Cir.2002); § 1326(d). To show actual prejudice, the alien must establish that, but for the errors of which he complains, there is a reasonable likelihood that he would not have been deported. *See United States v. Mendoza–Mata,* 322 F.3d 829, 832 (5th Cir.2003). If the alien fails to establish any one prong of the test, the court need not consider the other prongs. *Id.*

*United States v. Garrido*, 519 F. App'x 241, 242 (5th Cir. 2013).

### C. Analysis

Having carefully reviewed all of the evidence in the record, including the exhibits from both parties, the live testimony, and the testimony by deposition, the Court agrees with the Government that Defendant's removal proceedings were not fundamentally unfair.  First, the Court finds that these proceedings were conducted in Spanish.  Second, the Court finds that the Defendant was given a one-on-one interview, was advised of his rights, and simply declined to exercise them.

### 1. The removal proceedings were in Spanish.

Concerning the first issue, the Court concludes that the proceedings were conducted in Spanish.  The Court bases this decision on the Government's witnesses, the Government's exhibits, and the Defendant's own testimony.

First, the Court believes the Government's witnesses that they spoke Spanish rather than English.  Border Patrol Agent Roberto Payan testified that he was a native speaker in Spanish and that he spoke Spanish every day as part of his job. (Doc. 25 at 48.)  This was demonstrated at the hearing when Payan translated parts of the Orantes Aviso form (U.S. Ex. 5), a document written in Spanish and given to El Salvadorian aliens such as the Defendant. (Doc. 25 at 58-61). Payan also testified that everyone at the McAllen station of which he is aware speaks Spanish because "they have to be certified to get the job, for employment." (*Id*.)  Special Agent Jose Meza conducted the Defendant's virtual processing, and he stated that, while he does not consider himself fluent in Spanish, he passed two exams with the Border Patrol and has been employed there for seven years. (Doc. 31 at 8-9.)  The Court finds it highly unlikely that these agents – or any other agents involved in the Defendant's removal proceeding - would be able to perform their jobs without knowing how to converse with the Defendant in Spanish.

Having concluded that the agents speak Spanish, the Court finds believable their testimony that they speak to aliens such as the Defendant in Spanish.  Payan testified that his interactions with people are usually in Spanish.  (Doc. 25 at 52.) He initiates conversations in Spanish unless a subject responds or asks him a question in English.  (*Id*.)  But if the subject does so in broken English, Payan still responds in Spanish. (*Id*.) Similarly, Meza testified that he typically does his virtual processing interviews in Spanish because "there is a very, very minute chance that any of these people speak English.  Everything always has to be done in Spanish." (Doc. 31 at 12.)  Meza said there are "very, very few times" where he conducts the interview in English, "[b]ut for about 99.9 percent of the time, everybody speaks Spanish, so I just go … ahead and do it in Spanish." (*Id*. at 12-13)  Meza asks them if they speak English, and, when they say no, he proceeds in Spanish. (*Id*. at 13.)  Meza also stated that the only reason to conduct the interview in a language other than Spanish would have been if Defendant felt comfortable enough to go through in English, but, because Defendant did not, Meza conducted the interview in Spanish. (*Id.* at 23.)  Thus, while neither Payan nor Meza remembered the Defendant's case specifically, the Court finds that it was standard procedure to interact with aliens in Spanish and that the agents did so with the Defendant.

Additionally, the Government's exhibits, consisting of completed forms from the removal proceeding, reflect that the Defendant understood what was happening.  Both Payan and Meza testified that the Defendant would supply all of the information on the I-217 form (U.S. Ex. 6.). (Doc 25 at 62, Doc. 31 at 21.)  Payan testified that the subject also supplies the information on the I-213 form (U.S. Ex. 1.)  Moreover, Meza testified that, during the interview with Defendant reflected on I-867A form (U.S. Ex. 2), Meza "transcribe[s] everything verbatim as much as [he is] able to understand what they are saying" and that the answers are "pretty easy to translate" to

6

English because they are "very short, precise answers." (Doc. 31 at 17-18.) The completed forms submitted as the Government's exhibits contain detailed information such as the Defendant's name, date of birth, place of birth, mother and father's names, and school. (*See, e.g.,* U.S. Ex. 6.) All of this reflects that the Defendant understood these proceedings.

Indeed, though Defendant gave a different account than the Government's evidence as to what happened during the removal proceedings (*see* Doc. 25 at 23-33), the Defendant was specifically asked about the accuracy of different information contained in the removal documents, and he confirmed some of it. (*Id.* at 37-38.) Concerning the I-831 form (U.S. Ex. 1), the Defendant acknowledged that his name, his birthplace, and his parents' names were all accurate, and that the document accurately reflected that he was found with no money in his possession. (Doc. 25 at 37-38.) Concerning the I-867A form (U.S. Ex. 2), which contained a purported interview with the Defendant, he acknowledged that his birth year and birth place were accurate in those documents as well, though he denied that he crossed the Rio Grande on a raft and that he was going to Miami to work. (Doc. 25 at 37-40.) Finally, concerning the I-217 form (U.S. Ex. 6), the Defendant disputed that San Salvador was 46 kilometers from his home city, but he admitted that, as stated in the form, he was Catholic, his "last permanent residence in country of citizenship" was correct, and his mother and father's names were correct. (Doc. 25 at 40.) Even considering the purported inaccuracies (including the one concerning the Defendant's scar), the Court still finds that, contrary to Defendant's testimony, he understood what transpired.

### 2. The Defendant was interviewed, advised of his rights, and declined to exercise them.

The Court also finds that, based on the Government's witnesses and exhibits (i.e., the documents from the removal proceeding), the Defendant was given a one-on-one interview, was advised of his rights, and simply declined to exercise them. Concerning the first, Meza described

7

in detail the remote processing that he generally conducts. (*See* Doc. 31 at 9-20.) Payan also described the multiple interviews that were conducted, as reflected in U.S. Exhibits 1-2. (Doc. 25 at 53-57.) According to Payan, the relevant paperwork is gone over with the Defendant two to three times. (*Id.* at 57) The Court believes this testimony.

Moreover, the testimony of the Government's witnesses and its exhibits reflect that the Defendant was advised several times of his rights with respect to asylum. For instance, the Orantes Aviso form (U.S. Ex. 5) is specifically designed for people from El Salvador, was written in Spanish, and describes what the alien can do if he fears persecution. Payan testified there is no reason not to read those rights. (Doc. 25 at 52.) Additionally, the I-867A form (U.S. Ex. 2) is, according to Meza, translated into Spanish, and it also contains a list of rights read to the immigrant. (Doc. 31 at 11.) Payan further stated that the virtual processor was supposed to read those rights in every case, and he was not aware of times in which that was not done. (Doc. 25 at 75-76.) This form specifically states that:

> U.S. law provides protection to certain persons who face persecution, harm, or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

(U.S. Ex. 2.) As with Payan, Meza said that there is no reason for him to skip or not read those rights to the individual. (Doc. 31 at 12.)

The Court finds these officers believable given Meza's testimony about the consequences of the Defendant claiming asylum (or lack thereof) and given Payan's testimony about the frequency of credible threat claims. Concerning the first, the I-867-A form reflects that, during Meza's interview with Defendant, Defendant was asked about fear of persecution or torture. (*Id.*)

Defendant answered "No." Meza testified that, if Defendant had answered "yes," then Meza would have written down "yes" and provided a quick synopsis for the record. (Doc. 31 at 20.) Then, in another box, he could have clicked "Credible Fear," which would have taken him to another page where he could have marked two more boxes and inputted a date. (*Id.*) Meza testified that it makes no difference to him whether an immigrant makes a credible fear claim, and he has no reason to discourage an alien from making such a claim. (*Id.*) Second, concerning the frequency of credible threat claims, Payan testified that "[c]redible fear is something that happens quite a bit" for people from El Salvador. (Doc. 25 at 55.) Payan further said that individuals are not discouraged from making credible fear claims. (*Id.* at 56.) For all of these reasons, the Court believes the agents that they had no reason not to read Defendant his rights.

Finally, the Court finds that, having been advised of his rights, the Defendant simply did not exercise them. As stated above, the Defendant was specifically asked for the I-867A form about whether he was in fear of persecution or torture, and Defendant said "no." (U.S. Ex. 2.) This answer was also on the I-867B (U.S. Ex. 3), which was based on the answers Defendant previously gave for the I-867A (Doc. 31 at 21) and which contained the Defendant's signature.(Doc. 25 at 30-31). Finally, the Orantes Aviso (U.S. Ex. 5) contained two blocks on the second page:

> [ ] 1. I wish to request an interview before an asylum officer to decide whether I have credible fear or persecution. I understand that if the asylum officer decides I have a credible fear or persecution, I will get a hearing before an immigration judge to determine whether I remain in or will be removed from the United States
>
> [ ] 2. I do not want to have an interview before an asylum officer and I wish to be returned to my own country. I understand that I may be held in detention until my removal. I also understand that I cannot return for five or more years unless I've obtained permission from a secretary of homeland security of the United States."

9

(Doc. 25 at 59-60.).  Here, the first box has a light mark through it, and the second box has a darker mark through it. (*Id*. at 61.) The document is signed by the Defendant. (*Id*. at 59-60, 31-32.)  The Court finds that all of these documents demonstrate that the Defendant decided not to make a claim for asylum.[1]

This conclusion is confirmed by Payan's testimony.  When discussing the Orantes Aviso, Payan stated:

> Q:   Now, as part of the process that you just described, is the individual just given these papers and told to sign without reviewing them?
>
> A:   No.  The individuals, when they sit down in front of the verification, they're explained the illegal entry, the five years – they put a certain – five years for the first time that they came into the country illegal.  For five years, they're not able to apply to come back into the United States.  And if they were to come back again, it would be 10 years and then 20 and then inadmissible.  **It's confirmed through and through.**  Name, date of birth, country, rights, before they start signing off."

(*Id*. at 58-59 (emphasis added).)  The Court finds his testimony more credible than the Defendant's testimony to the contrary. (*Id.* at 36-37, 44.)

### 3. Closing

In sum, the Court finds that the Defendant has not proven that the prior removal proceeding was fundamentally unfair.  The Court further finds that the proceedings were conducted in Spanish and that the Defendant was given individual interviews and was adequately advised of his rights.   Defendant simply chose not to exercise those rights.  The Court acknowledges that the Defendant testified contrary to these findings, but, having weighed all the evidence, the Court concludes that the Government's version is more believable.

---

[1] The Court notes that U.S. Border Patrol Agent Richard Treglia testified that, when Defendant was detained in Baton Rouge, he was asked in Spanish if he had any fear of going back to his country, and he replied no. (Doc. 25 at 87-91.)

Ultimately, while the Court is sympathetic to the Defendant's situation, he has failed to give an adequate explanation for why these agents would act contrary to standard procedure. Defendant refers to an O.I.G. report reflecting understaffing, undertraining, and underfunding of border agents and cites statistics and testimony purporting to show the mathematical impossibility of agents adequately processing the number of aliens at the McAllen station given the number of agents working there. But even if that evidence was accepted as true, and even if that evidence showed why the agents deviated from standard procedure, it fails to show why the agents would take the next steps: lying on official forms, forging the Defendant's mark, and committing perjury, all to deport this particular Defendant. The Court finds that it makes little sense for them to risk their jobs or their freedom, simply because their agency is underfunded or understaffed.[2] The Court also finds this particularly unbelievable considering the fact that Agent Payan appeared highly credible and professional on the witness stand.

For this and the above reasons, the Defendant has failed to satisfy one of the required elements for collaterally attacking his earlier removal. As previously stated, "[i]f the alien fails to establish any one prong of the test, the court need not consider the other prongs." *United States v. Garrido*, 519 F. App'x 241, 242 (5th Cir. 2013) (citation omitted). Because the Court has found that the proceedings were fundamentally fair, the Court need not analyze the other factors argued by the parties.

---

[2] *See United States v. Benitez-Villafuerte*, 186 F.3d 651, 660 (5th Cir. 1999) ("Additionally, we summarily reject Benitez's second charge of bias—that the INS purportedly has a pecuniary interest in his deportation. Although the INS's congressional funding depends to some extent on its statistical workload in apprehending and deporting illegal aliens, this fact provides too tenuous an influence to warrant a presumption that the INS or its personnel had a direct personal, substantial, and pecuniary interest in Benitez's deportation. Instead, the alleged pecuniary interest here is of the type identified by the Supreme Court as being 'so remote, trifling and insignificant that it may fairly beApril 22, 2016 supposed to be incapable of affecting the judgment or of influencing the conduct of an individual' INS hearing officer.") (quoting *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813, 827 n. 3, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)).

## IV. Conclusion

Accordingly,

**IT IS ORDERED** that the Motion to Dismiss Indictment (Doc. 14) filed by Defendant Erick Mena-Flores is **DENIED**.

Signed in Baton Rouge, Louisiana, on <u>April 22, 2016</u>.

_____
**JUDGE JOHN W. deGRAVELLES
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA**